June, Gravel had been successful in locating a prospective buyer. On June 8, 2003, the debtors accepted a written "Offer to Purchase Real Estate" (the "Purchase Offer"); and on June 18, 2003, executed a purchase and sale agreement with a closing date of July 31, 2003. Gravel and the debtors tried for an extended period of time to get Attorney Lafayette to seek court approval, and finally extracted a promise from the aforesaid paralegal to get Attorney Lafayette to execute the necessary request.[13]

On June 18, 2003, Attorney Lafayette for the first time filed an application to employ Gravel in order to "marketing(sic) and procure buyers." But it was too late. The Purchase Offer, attached to the motion, showed that the buyer had already been procured and failed to set forth any reason for the failure to seek earlier approval of the broker. Accordingly, employment of the broker now satisfied no standard permitted under In re Jarvis, 53 F.3d 415 (1st Cir. 1995), and the Court denied the request.

On June 30, 2003, Attorney Lafayette finally filed a motion seeking to sell the property, requesting expedited determination. But the motion failed to comply with MLRB 2002-5(A) (Contents of Notices of Sale) and Official Local Form 2(A)(Notice of Intended Private Sale of Estate Property). Accordingly, the motion to sell was denied without prejudice.

Not for two weeks did Attorney Lafayette respond, despite being told that the debtors were desperate to move to Florida prior to August 10, 2003 in order to arrange the special needs services for their child. On July 14, 2004, after telling Peter Caci that the

---

[13]According to the debtors, the agreement "sat on [the paralegal's] desk" for an extended period of time without action, while the debtors called repeatedly asking that Attorney Lafayette obtain the requisite approval. The paralegal told Mr. Caci that she had been unable to get Mr. Attorney Lafayette to file it. (Evidentiary hearing, June 28, 2004; testimony of Peter Caci).

18

errors incident to the failed motion to sell were the result of the "personal problems of his paralegal," Attorney Lafayette filed renewed motions to sell the property, for shortened notice, and for the retention of Gravel as broker. These motions were deficient for a myriad of reasons, among them that the employment motion (really one of reconsideration) was filed late, one of the attached documents appeared to be altered without notice to the court, notice to creditors was insufficient, and a recently extended closing date was not disclosed. Still, the motions were set for emergency hearing on July 28, 2003 at which the Court took evidence from a representative from Gravel and from Mr. Caci. Based on that evidence presented, the Court relieved Attorney Lafayette of his responsibilities as counsel for the debtors. That role was thereafter ably filled by attorney Joseph Collins as an accommodation to the debtors and as a courtesy to the Court. The following day, the Court allowed both the motion to sell and the motion to employ Gravel, notwithstanding their deficiencies, having specifically found that the Jarvis standard of "extraordinary circumstances" was met by the "profound incompetence" of the debtors' previous counsel.

Attorney Lafayette filed a fee application, now before the Court, on August 15, 2003. It seeks total compensation in the sum of $5,320.61 (as of August 15, 2003), of which $4,609.61 remains unpaid. Of the sum sought to be allowed, $4,755.00 is the component sought for professional services. Attorney Lafayette claims he devoted 13.5 hours, at the rate of $320 per hour, and paralegals devoted 7.2 hours at rates ranging from $35 to $65 per hour. An additional sum of $565.61 was sought for reimbursement of expenses. Attorney Lafayette reported payments received in the amount of $711.00.

On August 29, 2004, the Chapter 13 trustee and the United States trustee filed their objections to the fee application. The Chapter 13 trustee complained with respect to

19

Attorney Lafayette's role in connection with the Dangutis employment and the fiasco relating to the sale of the property, as well as the requested hourly rate of $320 per hour.[14] The United States trustee concurred with the Chapter 13 trustee's complaints.

An evidentiary hearing was held on the fee application on September 12, 2003. The Chapter 13 trustee and the United States trustee renewed their previously filed complaints with respect to the services rendered by Attorney Lafayette. They also reminded the Court that: (1) after a hearing in the Dangutis bankruptcy case, it had authorized the Chapter 13 trustee to disburse to Mr. and Ms. Caci the sum of $200, representing the fee Dangutis had improperly charged to the debtors for the home inspection; and (2) Attorney Lafayette had not only opposed that order before the court, but had filed an appeal of the order while still representing the Mr. and Ms. Caci. With respect to his services in the Caci case, Attorney Lafayette blamed problems in the case on a non-material error in a position taken by the Chapter 13 trustee early in the case. The fee application was thereafter taken under advisement.

F.   Mark and Angela Bennett

Mark and Angela Bennett filed a Chapter 13 case on January 6, 2003 and were represented by Attorney Lafayette. Simultaneously, Attorney Lafayette filed a "Disclosure of Attorney Compensation for Debtor" (the "Bennett Fee Disclosure"). The Bennett Fee Disclosure was similar in form and content to the LaFrance, Oyola, Rolon, Daigneault and

---

[14] The Court chooses not to go into other objections by the Chapter 13 trustee with respect to specific time entries in light of the ultimate disallowance of all compensation on other grounds.

20

Caci Fee Disclosures, containing the same infirmities and the same hourly rate. The retainer was here represented to be $500, against a fee of $3,000 with the same conditions set forth in the LaFrance, Oyola, Rolon, Daigneault and Caci Fee Disclosures.

On March 14, 2003, the Chapter 13 trustee filed an objection to the debtors' exemptions, as well as a motion seeking that Attorney Lafayette be ordered to disgorge fees. Both filings cited numerous errors in the Schedules and Chapter 13 plan. Most egregiously, Attorney Lafayette, an experienced practitioner, had combined federal and state exemptions in the debtors' Schedule C in violation of § 522(b) of the Bankruptcy Code and settled law. Further, the debtors' Schedule J included a monthly expense of $276 for the cost of monthly money orders for the plan payments. These issues were raised by the Chapter 13 trustee at the section 341 meeting on February 12, 2003, and Attorney Lafayette was requested to amend the affected Schedules. Over 30 days later, Attorney Lafayette had taken no action to remedy the issues.

On March 18, 2003, in response to the motion seeking disgorgement of his compensation, Attorney Lafayette filed a motion seeking an extension within which to respond to the Chapter 13 trustee's motion. He said he was out of Massachusetts at a continuing legal education conference with the Massachusetts Academy of Trial Attorneys and would remain there until March 24, 2003. Thereafter, he was scheduled for dental surgery for which there would be an approximately seven day recuperation. He requested that the response deadline be extended to April 11, 2003. Attorney Lafayette's request for extension was allowed. But Attorney Lafayette did not meet the extended deadline. On April 16, 2003, Attorney Lafayette filed a motion asking the Court to allow his response to be filed late. He informed the Court therein that he had been ill on account of a tooth

21

abscess and was scheduled to have dental surgery on April 25, 2003. That motion was allowed on April 18, 2003 and the underlying motion to disgorge was set for hearing on May 14, 2003.

In the meantime, the Chapter 13 trustee's objection to the debtor's exemptions came on for hearing on April 16, 2003. It now being more than 60 days from the initial request of the Chapter 13 trustee that Attorney Lafayette cure the obvious infirmities in Schedule C, the Court sustained the Chapter 13 trustee's objection and ordered the debtors to file an amended Schedule C within seven days. The Court also ordered Attorney Lafayette to file a fee application with 14 days, the Court's intention being to have that fee application available for examination at the hearing on the Chapter 13 trustee's motion to disgorge Attorney Lafayette's compensation on May 14, 2003. Finally, the Court issued an order to show cause why the case should not be dismissed or sanctions imposed on account of the debtors' failure to file an amended plan (on account of an unrelated problem) as required by the court's order of March 10, 2003.

The debtors' amended Schedule C was timely filed, as was Attorney Lafayette's fee application. Both the Chapter 13 trustee and the United States trustee filed objections. The Court then set a hearing on the fee application to be heard together with the Chapter 13 trustee's motion seeking disgorgement and the show cause order on May 14, 2003. Those hearings could not go forward as scheduled, however, because Attorney Lafayette had failed to give proper notice of the hearing on his fee application. Accordingly, the

22

Court continued all matters to June 11, 2003 and ordered Attorney Lafayette to notice creditors forthwith.[15]

On June 11, 2003, in response to the Court's April 16 order to show cause, Attorney Lafayette reported that the delay in filing an amended plan related to unliquidated priority claims filed by taxing authorities, including the City of Springfield. While this was not a legitimate excuse for failing to timely seek an extension of the deadline for filing an amended plan, the Court ordered the debtors to file certain tax returns (by August 1, 2003) and any pleadings designed to liquidate the City of Springfield claim (by June 30, 2003). Attorney Lafayette failed to file the latter by the deadline. On July 2, 2003, Attorney Lafayette filed a motion to enlarge time to file pleadings relative to the City of Springfield claim and a motion to compel the City of Springfield to file a proof of claim. He claimed that the documents had been timely prepared but inadvertently left behind in the office when unrelated documents were filed on June 30, 2003. That request for leave to file those documents late was set for hearing on July 30, 2003. Also set for hearing that day was a request for reconsideration of an order of the court, dated June 18, 2003, granting relief from the automatic stay to Deutsche Bank National Trust Company (the "Bank") in order to conduct a foreclosure on certain property of the debtor. The bank's motion seeking that relief had gone unanswered.

On July 30, 2003, Attorney Lafayette withdrew his motion relative to the City of Springfield claim and the Court allowed the motion for reconsideration of its order granting

---

[15]The fee application and the Chapter 13 trustee's motion to disgorge were originally included in the Case Management Order, described below, but were subsequently mooted by the denial of all compensation, ordered on September 24, 2003, as further described herein.

23

relief from the automatic stay to the Bank, further ordering the debtors to become current on all postpetition payments to the Bank on or before August 6, 2003. In light of Attorney Lafayette's failures to meet the referenced deadlines since the filing of the last fee application, however, the Court also ordered that Attorney Lafayette update his fee application on or before August 15, 2003. It was not updated and after a hearing upon a show cause order, dated September 16, 2003, all fees were disallowed by order of September 24, 2003. Attorney Lafayette was ordered to disgorge any sums received (excluding the filing fee) to the debtors by October 1, 2003 and to file a certificate of compliance on or before October 8, 2003. Attorney Lafayette appealed that September 24, 2003 order to the United States District Court for the District of Massachusetts. The District Court subsequently affirmed by order dated April 9, 2004 (Ponsor, J.). Nevertheless, notwithstanding his failure to seek a stay pending appeal, Attorney Lafayette failed to comply with the September 24, 2003 order until after receipt of this Court's order of May 18, 2004, ordering him to show cause why he should not be found in contempt.

G.   Stefan Davis

Stefan Davis filed a Chapter 13 case on January 10, 2003 and was represented by Attorney Lafayette. Shortly thereafter, Attorney Lafayette filed a "Disclosure of Attorney Compensation for Debtor" (the "Davis Fee Disclosure"). The Disclosure was similar in form and content to the LaFrance, Oyola, Rolon, Daigneault, Caci and Bennett Fee Disclosures, containing the same infirmities and the same hourly rate. The retainer was here represented to be $115, against a fee of $3,000 with the same conditions set forth in the LaFrance, Oyola, Rolon, Daigneault, Caci and Bennett Fee Disclosures.

On March 12, 2003, the Chapter 13 trustee conducted the Section 341 meeting. There, she complained of numerous discrepancies in the schedules and plan. For example, the plan listed a certain Lisa Russell as the holder of a mortgage on the debtor's residence, but then proceeded to describe a cram-down of her undersecured claim in an automobile. In fact, argued the Chapter 13 trustee, the automobile was unencumbered; and if Ms. Russell held a mortgage on the residence, the claim could not be modified consistent with 11 U.S.C. § 1322(b)(2). Also, while the plan provided for payment of priority claims in the amount of $6,500, the schedules listed priority claims in the amount of $9,100. The Chapter 13 trustee asked Attorney Lafayette to amend the plan to correct these obvious errors. He failed to do so. On April 11, 2003, the Chapter 13 trustee filed a motion to dismiss. As grounds for dismissal, the Chapter 13 trustee alleged:

> 4. The Debtor has failed to file an amended plan as requested by the trustee at the meeting. The trustee submits that the failure of the Debtor to file and provide these documents is an unreasonable delay by the Debtor that is prejudicial to creditors and constitutes grounds for dismissing this case pursuant to § 1307(c)(1) of the Code.

Attorney Lafayette responded promptly with the debtor's response. All of the Chapter 13 trustee's allegations set forth in the motion to dismiss were admitted. He noted that that the "matter is curable in an amended plan." Perhaps so, but Attorney Lafayette did not file one.

On April 23, 2003, the Chapter 13 trustee followed with a "Motion . . . for Order Requiring Counsel to Disgorge Retainer and to Require the Filing of a Fee Application." The motion complained again of Attorney Lafayette's failure to properly respond to the necessary modification requests by the Chapter 13 trustee.

25

The Chapter 13 trustee's motion to dismiss the case was heard on May 7, 2003. On that date, the Court continued the motion to June 11, 2003, and ordered the debtor to file an amended Chapter 13 plan on or before June 4, 2003. The debtor did not comply. On June 9, 2003, five (5) days after the court ordered deadline, Attorney Lafayette filed a motion to extend the deadline. As grounds, Attorney Lafayette claimed that the plan was not filed because of ongoing negotiations with the Internal Revenue Service with respect to its claim. Attorney Lafayette provided no information as to why he had neglected to seek an extension of the deadline before it had run. Accordingly, the Court continued the hearing on the Chapter 13 trustee's motion to dismiss to July 11, 2003, but reserved judgment on the "propriety" of the late filed motion to extend the deadline for filing the amended plan. By July 11, 2003, the Chapter 13 trustee had lost interest in her motion to dismiss and withdrew the motion. An amended plan had been filed on June 18, 2003 and modified to her liking.

The Chapter 13 trustee's motion seeking that Attorney Lafayette's fee be disgorged/ disallowed was heard on May 14, 2003. On that date, the Court continued the hearing, but ordered Attorney Lafayette to file a fee application on or before June 11, 2003. The instant application was filed on May 29, 2003 and the Chapter 13 trustee filed her opposition. That opposition complained that:

1. the initial plan filed by Attorney Lafayette contained the errors referenced above, which errors were not rectified in a reasonably prompt fashion;

2. Attorney Lafayette's application sought compensation for amending the plan ($1,043.50) and for preparing his fee application ($564.50), neither of which would have been necessary but for his own errors;

3. certain services were not properly itemized in 1/10 hours as required by MLRB 2016-1(a)(1)(B);

26

4. the fee application, the plan and the Fee Disclosure reflect discrepant amounts for the retainer and the amounts due;

5. the fee application does not include the prepetition fee agreement required by MLRB 2016-1(a)(1)(D); and

6. the hourly rate charged by Attorney Lafayette ($320) is excessive, particularly in light of the Bernier case, in which Judge Rosenthal found $225.00 to be a reasonable hourly rate for Attorney Lafayette in Chapter 13 cases.[16]

On June 11, 2003, this Court took the fee application under advisement, ultimately including it in this Court's Case Management Order, more fully described below.

II. THE CASE MANAGEMENT ORDER

In light of the many objections filed by the Chapter 13 trustee to Attorney Lafayette's fee applications in the LaFrance, Oyola, Rolon, Bennett and Davis cases, the Court issued, on June 24, 2003, a Case Management Order. In that Order, the Court noted that:

A. in each of the referenced cases, Attorney Lafayette had filed, at the direction of this Court, a fee application;

B. in response to each of the said fee applications, the Chapter 13 Trustee and/or the United States Trustee objected citing various actions or failures to act by Attorney Lafayette in his representation of the applicable debtor (the "Service Objections");

C. Attorney Lafayette had not disputed the facts underlying the Service Objections;

D. this Court took judicial notice of similar fact patterns in other cases in which Attorney Lafayette had served as counsel;

---

[16] In re Bernier, No. 02-46102-JBR (February 27, 2003) (unpublished). Later, Judge Rosenthal confirmed that ruling in In re Martinez, No. 02-45992-JBR (June 26, 2003) (unpublished).

27

    E.    the Chapter 13 Trustee and the United States Trustee had also challenged the amount of the hourly compensation rate sought by Attorney Lafayette (the "Rate Objections"); and

    F.    Attorney Lafayette and the United States Trustee had each requested an opportunity to submit a memorandum of law in connection with the Rate Objections.

Pursuant to the Case Management Order, the Court:

    A.    set for evidentiary hearing on July 22, 2003, the fee applications in each of those cases; and

    B.    ordered Attorney Lafayette to show cause why he should not be further ordered to:

        1.    file, within 120 days of the date of this Court's order, a fee application in each pending Chapter 7 and 13 case in the District of Massachusetts in which he seeks further compensation from a debtor or a further distribution from a Chapter 13 trustee, said fee application(s) to be filed before the bankruptcy judge assigned to each such case; and

        2.    until further order of this Court, deposit any fee thereafter received from any Chapter 13 or 7 debtor in the District of Massachusetts in his client trust account and refrain from disbursing those funds until a fee application permitting such disbursement is granted by the bankruptcy judge assigned to such case;

    C.    provided Attorney Lafayette until July 8, 2003 in which to file any Pre-Trial Memorandum; and the United States Trustee and the Chapter 13 Trustee until July 16, 2003 to file any response thereto.

The United States trustee filed its Pre-Trial Memorandum on July 8, 2003. Attorney Lafayette failed to file a Pre-Trial Memorandum. On July 16, 2003, six (6) days prior to the evidentiary hearing, Attorney Lafayette filed a "Motion to Continue Hearing." As grounds, Attorney Lafayette stated that he was scheduled during that time to attend a conference in San Francisco with the Association of Trial Lawyers of America. The motion was denied.

Two days later, Attorney Lafayette filed an "Emergency Second Motion to Reschedule Hearing." This time, Attorney Lafayette sought a continuance of the hearing on the grounds that he had another tooth abscess for which he had been seen by a dentist and prescribed treatment and medication. The medication, he represented, had a tendency to render him less alert than "he would like to be." And the condition caused him to have a "ringing in the ears." The motion was denied.

The evidentiary hearing was held on July 22, 2003. But just prior thereto, Attorney Lafayette filed a "Motion to Present Newly Discovered Evidence Related to Counsel's Physical/Dental Health Issues" and a "Motion to Impound So Much of the Files That Related to Counsel Physical/Dental Health Issues." Attorney Lafayette complained that for several years he had suffered from a painful back condition, exacerbated, he said, from a recent fall just outside of the entrance to the federal court. He sought to present this information to the Court (together with information previously presented with respect to his dental condition) as an explanation for his service failures to his clients, and sought a continuance so that the nature of his back condition (which had been recently retested) could be properly diagnosed. The motion seeking leave to present information with respect Attorney Lafayette's back condition was allowed, but the request seeking a continuance to present further evidence with respect thereto was denied for the reason that the diagnosis of Attorney Lafayette's condition was irrelevant to the issues before the Court.[17] The motion to impound was denied for essentially the same reason.

---

[17] Neither the Court nor the Chapter 13 trustee or United States trustee were challenging the validity of Attorney Lafayette's medical or dental problems; accordingly, a full diagnosis to explain their source was not relevant.

29

At Attorney Lafayette's request, counsel to the United States trustee spoke first at trial. He argued first that a reasonable range of hourly rates for Chapter 13 practitioners in this district was from $150 to $225 per hour, and that it was Attorney Lafayette's burden to show otherwise. He then addressed the various excuses raised by Attorney Lafayette with respect to his service failures to the instant debtors, characterizing them as sloppy and careless. Further, he noted that, if credence were to be given to Attorney Lafayette's various claims of medical disability, he had serious concerns about such an attorney continuing to render services in a state of diminished capacity. He expressed fears for the legal well-being of all consumer debtors under Attorney Lafayette's care.

Attorney Lafayette responded to the question of the applicable lodestar rate in two ways. First, he argued that any prospective setting of the lodestar rate in future cases was "highly unconstitutional,"[18] because it deprived him of "an opportunity to earn a living and to process the law associated with those cases." Second, although Attorney Lafayette maintained on the one hand that he "accepted" the rulings in Grenier and Martinez, infra, particularly with respect to whether a typical Chapter 13 case consumed an average of 10 hours of attorney work, he quarreled with the rate set in those cases. He argued that the court had miscounted in calculating his rate at $225. Considering the $2,500 fee set in MBLR 13-7(b), discussed in greater detail below, the court should, according to Attorney Lafayette, have found an appropriate hourly rate for Chapter 13 practitioners to be $250 ($2,500 divided by 10 hours). Attorney Lafayette said he could not offer further insight into

---

[18] He did not cite the applicable provision of the United States Constitution.

30

the lodestar rate issue. He said that he found his research into the area "mind-boggling;" and, accordingly, he would rest this question with this Court's discretion.

In response to those portions of the Case Management Order that implicated MBLR 13-7(b), Attorney Lafayette turned again to his physical ailments. He insisted that those ailments were the cause of his service failures, yet denied that his use of medications left him with diminished capacity to represent his clients. And, while the fee applications now before the Court reflect significant time devoted by his paralegals, he claimed that he does not "delegate much of Chapter 13 to the assistants, other than stuffing envelopes and mailing. . . ."

In final argument, counsel for the United States trustee and the Chapter 13 trustee asked the Court to suspend - with respect to Attorney Lafayette - the automatic compensation provisions set forth under MLRB 13-7(b). The Chapter 13 trustee also suggested that the Court consider suspending Attorney Lafayette from practice before the Court for a limited period of time.

III. DISCUSSION

A. The Standards for Compensation in Chapter 13 Cases

The standards for allowance of compensation to professionals generally are set forth in § 330 of the Bankruptcy Code. 11 U.S.C. § 330 (2004). With respect to Chapter 13 cases, § 330 specifically provides:

> In a chapter 12 or chapter 13 case in which the debtor is an individual, the court may allow reasonable compensation to the debtor's attorney for representing the interests of the debtor in connection with the bankruptcy

31

> case based on a consideration of the benefit and necessity of such services to the debtor and the other factors set forth in this section.

11 U.S.C. §330(a)(4)(B) (2004).

And §330 further instructs with respect to compensation under any chapter:

> In determining the amount of reasonable compensation to be awarded, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including -
>
> (A) the time spent on such services;
>
> (B) the rates charged for such services;
>
> (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
>
> (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and
>
> (E) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. §330(a)(3) (2004).

In this Circuit, the methodology employed to evaluate the reasonableness of compensation for professionals is the "lodestar" approach. See Boston and Maine Corp. v. Moore, 776 F.2d 2, 6-7 (1st Cir.1985); Furtado v. Bishop, 635 F.2d 915, 920 (1st Cir.1980); Garb v. Marshall (In re Narragansett Clothing Company), 210 B.R. 493, 497 (1st Cir. BAP 1997); In re Bank of New England Corp., 142 B.R. 584, 586 (D. Mass. 1992); In re Act Manufacturing, 281 B.R. 468, 479 (Bankr. D. Mass. 2002); In re Anolik, 207 B.R. 34, n.11 (Bankr. D. Mass.1997); In re 1095 Commonwealth Ave. Corp., 204 B.R. 284, 290 (Bankr. D. Mass. 1997); In re Smuggler's Beach Properties, Inc., 149 B.R. 740, 743 (Bankr. D. Mass. 1993); In re First Software Corp., 79 B.R. 108, 112-13 (Bankr. D. Mass.1987); In re WHET, Inc., 58 B.R. 278, 285 (Bankr. D. Mass.1986). Courts first develop a point of

32

reference by determining a reasonable billing rate and then multiplying it by the number of hours which appropriate tasks should have consumed. Narragansett Clothing Company, 210 B.R. at 497.

The lodestar rate ought to take into account the type of work performed, who performed it, the expertise that it required, and when it was undertaken. Grendel's Den, Inc. v. Larkin, 749 F.2d 945, 950-51 (1st Cir. 1984). The court must "consider prevailing market rates in determining the lodestar, based on usual and customary rates in the jurisdiction . . . . No presumption exists that a professional is entitled to the amount he or she requests." Narragansett Clothing Company, 210 B.R. at 498-99. Once determined, the applicable rate is multiplied by the hours reported, after those which are duplicative, unproductive, excessive, or otherwise unnecessary are subtracted. Grendel's Den, Inc. v. Larkin, 749 F.2d at 950.

> Finally, the lodestar is adjusted by various factors, including:
>
> (1) the time and labor required; (2) the novelty and difficulty of the questions presented by the case; (3) the skill required to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee for similar work in the community; (6) whether the fee is fixed or contingent; (7) time pressures imposed by the client or the circumstances; (8) the amount involved and results obtained as a result of the attorney's services; (9) the experience, reputation, and ability of the attorney; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. Smuggler's Beach Properties, Inc., 149 B.R. at 743; In re First Software Corporation at 112.

Anolik, 207 B.R. at n.11.

The Court has an independent judicial responsibility to review the fees of professionals, even in the absence of an objection by a party in interest. In re First

Software Corporation, 149 B.R. at 111. The burden of proof is on the party requesting a compensation award. Narragansett Clothing Company 210 B.R. at 498. Where no evidence is presented to establish the customary rate, the court must rely "upon its own expertise in judging market rates for professionals in the jurisdiction in which it sits." Id. at 499.

Measuring proper compensation in Chapter 13 cases presents special challenges. Section 330(a)(4)(B) specifically directs the Court's attention to the welfare of the debtor rather than that of the bankruptcy estate. 11 U.S.C. §330(a)(4)(B) (2004). Furthermore, the economics of practice under Chapter 13 is different from those under Chapters 7 or 11. In Chapter 7 cases, counsel to the individual debtor is paid by the debtor, but is likely to be confronted with a finite set of problems (e.g., relating to exemptions and discharge) to be overcome within a rather limited period of time. In Chapter 11 cases, counsel to the debtor in possession may be called upon to perform extensive services, but can be paid from funds of the estate. See Lamie v. United States Trustee, 540 U.S. ---, 124 S. Ct. 1023 (2004); 11 U.S.C. § 1106; §327. But in Chapter 13, while the amount of available funds to pay for services may be small, the debtor's needs may be extensive. Proper representation of a Chapter 13 debtor requires the time and patience to identify the source of the debtor's financial difficulty in order to draft a reorganization plan that best addresses the debtor's problems. Once drafted, the reorganization plan may have to be negotiated with creditors and the Chapter 13 trustee, and may have to be amended, sometimes more than one time. Disputes as to the propriety of the plan's terms may spill out into the courtroom; and, once disputes are resolved, further plan modification may be required in order to achieve confirmation. And after all of that, the debtor may default and require

further legal assistance. Plan defaults, as well as defaults in the monthly payment of home mortgages, are commonplace.

The resources available to fund the typical Chapter 13 case come from the Chapter 13 debtor, an individual with a self-evident inability to raise substantial funds. The economics of a Chapter 13 practice therefore require that counsel to the Chapter 13 debtor use appropriate techniques in order to reduce the costs of doing business. The development of a practice with some measure of volume is commonplace; the employment of paralegals to reduce the average billable rate and the introduction of computer technology to reduce work time is often a necessity. Yet all of the business efficiencies must be fashioned so that they do not interfere with the high quality of legal services which Chapter 13 debtors deserve and the bankruptcy courts expect of all attorneys who practice before them.

The focus that §330(a)(4)(B) places upon the benefit of legal services to the Chapter 13 debtor, together with the unique economics of the Chapter 13 practice, has encouraged courts to seek efficiencies as well. While not abandoning the lodestar methodology entirely, some courts have adopted a "no look", "presumptive" or "initial fixed" fee standard to be applied to the "routine tasks" attendant to most Chapter 13 cases. See, e.g., In re Eliapo, 298 B.R. 392, 399-400 (9th Cir. BAP 2003)(collecting cases); In re Argento, 282 B.R. 108, 116-17 (Bankr. D. Mass. 2002); see also, Keith M. Lundin, Chapter 13 Bankruptcy, 3d Ed., Debtors' Attorney's Fees § 294-18 - 294-24. Typically, this method assumes that tasks common to all Chapter 13 cases will be covered by a standard fee promulgated in a local rule or guideline. Additional services relating to any unique

35

complexities of the case are then measured through some variant of the lodestar methodology.

The bankruptcy judges in the District of Massachusetts have retained the lodestar approach in evaluating fees for services rendered to debtors in Chapter 13 cases and have chosen not to adopt a fixed or presumptive fee. Often misunderstood, MLRB 13-7(b) is a rule of procedure rather than one of substance. It provides:

> Unless otherwise ordered by the Court, if debtor's counsel's total compensation prior to confirmation of a plan is $2,500 or less, the disclosure of the compensation in the Rule 2016(b) Statement shall be sufficient notwithstanding compensation for post confirmation services in amount not exceeding $500, and the filing of an itemized application for compensation shall be excused, unless the Court orders otherwise.

The message of Rule 13-7(b) is clear: if the fees of counsel to the debtor in a Chapter 13 case do not exceed $2,500 for prepetition services and $500 for postpetition services, then the attorney need neither amend a lesser disclosure in the attorney's Fed. R. Bankr. P. 2016(b) Statement, nor file a fee application in order to be entitled to payment - unless the Court orders differently. The assumption underlying Rule 13-7(b) is not that $3,000 is some form of floor or ceiling for appropriate compensation for debtor's counsel in a Chapter 13 case. Rather, the rule recognizes that it is so unlikely that the Court will disallow compensation of $3,000 or less when an attorney renders beneficial legal services to a Chapter 13 debtor that the preparation of a fee application would waste judicial resources and drive up costs to a debtor whose funds are better spent on a dividend to creditors. The Rule contains the fail-safe clause "[u]nless otherwise ordered by the Court" in order to ensure its underlying premise: that Rule 13-7(b) should have effect only where the Court believes it likely that the debtor receive beneficial services from debtor's counsel.

36

B.   The Various Fee Applications

Consideration of the instant fee applications begins with the selection of the lodestar rate. The United States trustee and the Chapter 13 trustee urge the Court to adopt the billing rate of $225 per hour selected in Grenier and Martinez. Attorney Lafayette's responses are are both inconsistent and inexplicable. While billing in amounts over $300 in each of the instant cases, he testified at the evidentiary hearing in connection with the Case Management Order first that he accepted the Grenier and Martinez rulings, then that they were wrong, and then that he found the inquiry "mind-boggling." More important, Attorney Lafayette offers absolutely no evidence to support any rate at all. In the absence of evidence to the contrary, this Court is left to take judicial notice of the average billing rates in Chapter 13 cases in the Western Division of the District of Massachusetts. This Court agrees with Grenier and Martinez that the average billing rate for services in Chapter 13 cases in the City of Worcester, Massachusetts is in the range of $150-225 per hour, and believes it no different in the four most western counties of this district. But this Court respectfully disagrees with the decision in those cases to place Attorney Lafayette at the upper end of that range. Careless and sloppy work, from which Attorney Lafayette's clients repeatedly required court intervention and rescue, suggest either that Attorney Lafayette's skill level is not consistent with that of the average practitioner or that he is not sufficiently motivated to bring it to that level. Accordingly, this Court sets Attorney Lafayette's lodestar rate at $150 per hour for each of the instant fee applications.

Identification of the number of appropriate billable hours and application of adjusting factors with respect to each of the fee applications now before the court requires more detailed scrutiny.

37